**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-270 (CJN)** |
| **v.** | : | |
| | : | |
| **LANDON MANWARING,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Landon Manwaring ("Manwaring") to 45 days in jail as a condition of 36 months of probation, as well as 60 hours of community service, $500 restitution, and the mandatory $25 special assessment.

I.      **Introduction**

Defendant Landon Manwaring, a 32-year-old resident of Vernal, Utah, and his mother, Susan Manwaring ("S.M."),[1] participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

---

[1] Separately charged in *United States v. S.M.*, 1:22-cr-307 (CJN), and scheduled to be sentenced by this Court on January 23, 2022.

[2] Although the Statement of Offense in this matter, filed on August 26, 2022, (ECF No. 7 at ¶ 3) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate

1

Defendant Manwaring pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) (Unlawful Parading, Demonstrating, or Picketing in the Capitol Building). As explained herein, a sentence of 45 days in jail as a condition of 36 months of probation, as well as 60 hours of community service, $500 restitution, and the mandatory $25 special assessment, is appropriate in this case because Manwaring (1) entered the Capitol through the Senate Wing Door while other rioters were entering the building through smashed out windows adjacent that door; (2) was inside the Crypt when a mob of rioters stormed past police officers and into further reaches of the Capitol; (3) walked to the vicinity of Speaker Pelosi's office suite, an area that would have been closed to the public even when the Capitol building was open to the public; (4) remained inside the Capitol for approximately half an hour; (5) minimized his conduct during a second interview with the FBI, falsely claiming that police had "welcomed" him into the Capitol building and that he saw no property destruction when he entered; and (6) committed another serious crime after January 6. Specifically, on July 20, 2022, he pleaded guilty in Utah state court to Dealing in Harmful Material to a Minor by Adult, in violation of Utah Crim. Code Ann. § 76-10-1206(1). On October 11, 2022, the state court sentenced Manwaring on that offense to 30 days of incarceration, with credit for 10 days already served, with the requirement that he serve the entirety of that jail term by December 31, 2022. The sentence in this case should be imposed consecutive to his state court sentence. *See* U.S.S.G. §5G1.3.

The Court must also consider that Manwaring's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers

---

losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Manwaring's crime, his attempt to minimize his conduct when the FBI first interviewed him, and his continuing criminal activity support a sentence of 45 days in jail as a condition of 36 months of probation, as well as 60 hours of community service, $500 restitution, and the mandatory $25 special assessment.

## II.        Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 7 (Statement of Offense), at 1-3.

### Defendant Manwaring's Role in the January 6, 2021, Attack on the Capitol

In early January 2021, Manwaring and his mother, Susan Manwaring ("SM"), traveled together from Vernal, Utah, to Washington, D.C. to attend rallies in support of former President Donald Trump. On January 5, 2021, Manwaring and S.M. attended a rally where they were informed by the speakers and fellow rally-goers that the plan for the next day, January 6, 2021, was for people to attend former President Trump's rally on January 6, 2021, and, after former President Trump's speech ended, then march to the U.S. Capitol to attempt to influence the Senate while it tallied the votes of the Electoral College.

On January 6, 2021, Manwaring and S.M. attended former President Trump's rally and then marched to the U.S. Capitol as planned. As he approached the U.S. Capitol building from the west, Manwaring saw metal bicycle rack barricades that had been pushed aside.

Manwaring and S.M. joined the mob that proceeded *en masse* to the U.S. Capitol's west plaza, where rioters were inside a restricted area and physically battling police amidst clouds of

tear gas. Manwaring and S.M. watched, filmed video and took pictures of the chaos using their mobile telephones. The photographs below show Manwaring and S.M., circled in yellow, within the mob on the west plaza.





Eventually, Manwaring and S.M. followed the mob up the exterior stairs to the U.S. Capitol building's second level, known as the Upper West Terrace.

At approximately 2:13 p.m., rioters used a stolen police riot shield and other objects to smash the windows on either side of the Capitol building's Senate Wing Doors. With the windows

shattered, rioters breached the Capitol building for the first time by jumping through the window over the broken glass:



Just ten minutes after the entry depicted above, at approximately 2:23 p.m., Manwaring and S.M. entered the U.S. Capitol building through the same Senate Wing Door.[3] At the time Manwaring and S.M. entered the U.S. Capitol building, an alarm was sounding, other rioters were climbing into the building through broken windows on either side of the Senate Wing Door, and at least one of the windows of the Senate Wing Door itself was broken. The moment the Manwarings entered the Capitol is depicted below, with the Manwarings circled in yellow.

---

[3] The defendant and S.M. claimed that police officers were waving people in at this breach/entry point, but the government has identified no evidence supporting this claim.



Over the next thirty minutes, Manwaring and S.M. walked throughout the U.S. Capitol building. Along the way, Manwaring saw broken windows, observed multiple uniformed and armed police officers, posed for photographs, and took photographs of other rioters.

Immediately after entering the Capitol building, Manwaring and S.M. turned to the right and walked past the shattered glass on the floor from the smashed-in window. As they walked down that hallway, S.M. took a photograph of Manwaring in which he appears on the far-left side of the frame, with his face turned toward the camera.



Manwaring and S.M. proceeded from the Senate Wing Door to the Crypt, where they encountered a mass of other rioters, who were stymied by a few police officers blocking the nearby stairs to access the Capitol's second floor. The Manwarings appear in the photographs below, circled in red in the first photograph and yellow in the second.





S.M. used her cell phone to photograph the scene inside the Crypt.



Shortly thereafter, the mass of rioters surged forward and overwhelmed the small group of officers guarding the stairway, which was near the Memorial Doors. Approximately two minutes after the other rioters breached that police line, Manwaring and S.M. joined the avalanche of rioters that streamed through that area and up the stairs, as pictured below with the Manwarings circled in red.



Once up the stairs, Manwaring and S.M. walked through Statuary Hall, as captured below with the Manwarings circled in red. Manwaring used his cell phone to photograph the scene.



From Statuary Hall, Manwaring and S.M. walked to the area outside of Speaker of the House Nancy Pelosi's office, which S.M. photographed. Manwaring appears below, circled in yellow. The United States does not have surveillance camera footage of either Manwaring or S.M. inside Speaker Pelosi's office suite, however.



From Speaker Pelosi's office suite threshold, Manwaring and S.M. walked to the Rotunda, where they spent approximately ten minutes.



Manwaring and S.M. then exited the Rotunda and walked down the old Supreme Court chamber stairs, returning to the Capitol's first floor, as pictured below with the Manwarings circled in red.



The defendant and S.M. finally exited the Capitol building at 2:53:47 p.m. through the Senate Wing Door, the same door through which they had entered thirty minutes earlier. The photograph below depicts the moment Manwaring and S.M. exited, with them circled in red.



Manwaring and S.M. were aware that the Senate intended to tally the Electoral College votes, and thus certify the 2020 presidential election of Joseph R. Biden, on January 6, 2021, the same day that they entered and participated in the occupation of the Capitol building.

In total, defendant and S.M. spent 30 minutes inside of the Capitol. Both Manwaring and S.M. have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Defendant's Interview with the FBI*

On August 11, 2021, approximately one year before he was charged in this case, Manwaring gave a voluntary interview to the FBI. Although Manwaring initially stated he would not answer any questions, he relented when the FBI agents informed him that they had pictures and GPS coordinates showing him unlawfully inside the U.S. Capitol building on January 6, 2021. During the ensuing consensual interview, Manwaring admitted traveling to Washington with his

mother, S.M., on January 5, 2021, and unlawfully entering the Capitol building on January 6, 2021. Manwaring consistently minimized his conduct, however, and claimed the police had welcomed him into the building. The government has not located any evidence that supports this claim.

Manwaring stated that on January 6, 2021, he and his mother arrived early to the area near the Washington Monument where former President Trump would be speaking and stayed for the entire rally. Manwaring remembered former President Trump mentioning the electoral vote and indicating he wanted everyone to go to the Capitol building after his speech. Manwaring claimed that while he was in D.C. to protest, he did not really know what he was protesting. He said he was just there to support former President Trump, though he admitted knowing that there was a Congressional vote happening on January 6, 2021.

Manwaring stated that after former President Trump's rally speech ended, everyone in the crowd walked over to the Capitol building and he and his mother just followed the crowd without any particular intent. Manwaring stated that while he noticed that there were barricades, such as bike racks, lining the sidewalks on the approach to the Capitol, they were not blocking anyone's path, they were not tied together, and he did not see anyone moving them. He claimed that the police let everyone into the Capitol building and that they weren't trying to block anyone's path. Manwaring's description is squarely at odds with videos of the scene on the west plaza and eyewitness descriptions of the conflicts between police officers and rioters there.

Manwaring further claimed that as he entered the Capitol building, he heard some of the nearby police officers say "welcome." He characterized the officers' demeanor as "welcoming" and "non-threatening." (Video evidence shows no law enforcement officers near Manwaring as he entered the Capitol building, let alone any officer welcoming him.) Manwaring claimed that the door through which he entered the Capitol was already open when he walked through it and that

he did not observe damage to the doors or windows, or hear any alarms, as he entered. (Video evidence shows that not only were the windows on either side of the Senate Wing Door shattered when Manwaring entered the Capitol, but that rioters were climbing through those broken windows on either side of Manwaring. Additionally, alarms were blaring.)

Manwaring stated that he and his mother walked through the hallways of the Capitol building but did not enter any offices. He said that while he saw officers wearing riot gear and displaying visible badges inside the building, he observed that none of them had their guns drawn and that they did not seem distressed by the rioters. Manwaring said that he and his mother meandered to the Rotunda, where they stayed for approximately five minutes before leaving the Capitol building through the same door they entered. Manwaring admitted seeing broken glass around the door as he exited. He asserted that he and his mother spent just 10-15 minutes inside the Capitol. (In reality, the Manwarings spent double the times he estimated – approximately 10 minutes inside the Rotunda and 30 minutes inside the Capitol building.) Manwaring did not express remorse or regret about his actions on January 6, 2021.

*The Charges and Plea Agreement*

On August 10, 2022, the United States charged Manwaring by a one-count information with violating 40 U.S.C. 5104(e)(2)(G). Manwaring was never formally arrested. On August 26, 2022, the Court held a combination hearing in which Manwaring had his initial appearance and pleaded guilty to the Information pursuant to a plea agreement. *See* ECF Nos. 5-7. The Court granted Manwaring release pending his sentencing. By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

**III.      Statutory Penalties**

Manwaring now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Manwaring faces up to six months of imprisonment and a fine of up to $5,000. Manwaring must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of one month in jail followed by 36 months of probation, 60 hours of community service, $500 restitution, and the mandatory $25 special assessment.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

*v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Manwaring's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Manwaring, the absence of violent or destructive acts is not a mitigating factor. Had Manwaring engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Manwaring's case is the fact that he entered the Capitol building through the Senate Wing Door just ten minutes after it was first breached, making him part of the initial wave of rioters that quickly overwhelmed law enforcement officers and provided the rioters with nearly unfettered access to the Capitol's chambers, offices, hallways, and other sensitive areas. While Manwaring was not wearing tactical gear himself, nor did he engage in violence, the true strength of the rioters was in the mob's sheer numbers, and he added to that power. The volume of rioters in the Crypt is what caused law enforcement officers to yield at one of the riot's first—and most important—interior chokepoints: the area just outside the Memorial Doors, where officers made a brief stand in an attempt to keep rioters from accessing the nearby staircase, which led to the Speaker's Lobby. Once rioters broke this line, they—including Manwaring and his mother—progressed up those same stairs. The area they were then able to access allowed rioters to access Speaker Pelosi's office suite. Inside, some of the Speaker's staff members were hiding in terror under a conference table. Some of the rioters who entered Speaker Pelosi's office[4] suite stole items, including a government laptop computer used by Speaker Pelosi. Others overturned her furniture, left threatening messages, and defecated. An avalanche is comprised of individual snowflakes. Without the mass of rioters, including Manwaring, all

---

[4] The government acknowledges that the Manwarings do not appear to have entered the interior of any of Speaker Pelosi's office suite spaces.

confronting them at once, the police may have been able to hold their position near the Memorial Doors and keep the rioters far more contained, and clear them from the Capitol building far sooner.

Additionally, Manwaring failed to express genuine remorse, or even accept full responsibility for his actions, prior to filing his sentencing memorandum. Instead, during his FBI interview he minimized his conduct at every turn, claimed that police welcomed him into the Capitol building, and insisted that he did not see the broken glass, notice the rioters climbing through windows, or hear the blaring alarms as he entered. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Manwaring

Landon Manwaring's criminal history consists of the July 20, 2022, conviction for Dealing in Harmful Material to a Minor by Adult described above, as well as prior convictions on April 12, 2010, for Driving under the Influence and Possession of Marijuana.

On May 11, 2022, Manwaring engaged in a sexually explicit online conversation with someone he believed to be a 13-year-old child but who was actually a state police officer pretending to be a child. According to the state charging document:

> The defendant told the child he would show her things like rubbing her clit and hitting her g-spot. The defendant then sent pictures of his penis and stated he would help her grab it and stroke it. He then sent a picture of his erect penis and asked [the child] if she would suck his penis. The defendant then agreed to meet up with the child.

*See* Ex. 1. The underlying police report, which summarizes the chat records, reveals that it was Manwaring who continually pushed the sexually explicit conversation forward, asking the "child" questions like how old was the oldest boy she had ever kissed, if she had ever done more than kiss, if she masturbated, and if she would be willing to touch and suck his penis. *See* Ex. 2. When Manwaring arrived at the pre-arranged location, he was arrested by state law enforcement officers.

He was originally charged with Enticing a Minor, in violation of Utah Crim. Code Ann. § 76-4-401, as the top count but that charge was dismissed as a condition of Manwaring's plea agreement. On October 11, 2022, the state court sentenced the defendant to five years of imprisonment, with all but 30 days suspended and credit for 10 days already served, followed by four years of probation, as well as a $750 fine. The court ordered that the defendant complete his jail sentence by December 31, 2022.

The government is unaware if Manwaring was employed on January 6, 2021, but he now reports that he works from home contributing to his mother's business of producing orthodontic equipment.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Manwaring's actions – before and during the riot – demonstrate the need for specific deterrence. According to Manwaring's FBI interview and his sentencing memorandum, *see* ECF No. 15 at 8, Manwaring entered the Capitol without thinking critically about his actions; he just followed the crowd. The Court must sentence him in a way that inhibits him from acting like a lemming in the future. Moreover, Manwaring demonstrated no real recognition of wrongdoing until he pled guilty and accepted responsibility. Indeed, during his FBI interview, he sought to minimize or excuse his criminal conduct at every turn.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Manwaring based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Manwaring has pleaded guilty to Count One of the Information, charging him with Unlawful Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, this Court has sentenced other defendants convicted of petty offenses to incarceration, For instance, in *United States v. Clifford Meteer*, 21-cr-630 (CJN), the defendant breached the Capitol after he followed a mob of rioters that overran the police at the Upper West Terrace Staircase. He was inside the Capitol for approximately 31 minutes and made his way to the Crypt, Statuary Hall, and just outside the House Chamber. Thereafter, he made

statements on Facebook and in three television interviews revealing a total lack of remorse and downplayed the violence on January 6. Like Manwaring, he lied to the FBI that he entered the Capitol on January 6. He had prior felony convictions and allegedly possessed 10 firearms and several rounds of ammunition in his home, even though he was prohibited from doing so because of his prior felony conviction. Like Manwaring, Meteer pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). This Court sentenced Meteer to 2 months' incarceration and 36 months' probation.

In *United States v. Dalton Crase and Troy Williams*, 21-cr-83 (CJN), the defendants initially entered the U.S. Capitol Grounds after they both saw violence against police amid clear evidence that the area was restricted, and then entered the Capitol Building through a door that had been broken open less than one minute earlier. They left and entered the building a second time, after which they discussed with each other how their conduct on that day was intended as a warning to their political foes. Inside the Capitol, they chanted with other rioters as they observed further violence by other rioters against police and remained on Capitol grounds after a city-wide curfew had been declared. Like Manwarning, they both pleaded guilty to violating Section 5104(c)(2)(G). This Court sentenced both defendants to 15 days' incarceration as a condition of probation pursuant to 18 U.S.C. § 3563(b)(10). Unlike Manwaring, they did not go near Speaker Pelosi's office suite, nor did they commit a serious crime after January 6.

In *United States v. Adam Honeycutt*, 22-cr-50 (CJN), the defendant climbed through a broken window and entered a conference room used by Members of Congress. He posted images to social media of confrontations between rioters and police and property destruction committed by other rioters. Most disturbingly, he helped to pass a long wooden plank to other rioters who were violently battling police in the Lower West Terrace Tunnel after he had exited the Capitol

Building. Before he was sentenced by this Court, he received an 18-month sentence of incarceration because of firearms and drug paraphernalia found in his residence during the execution of a search warrant for the January 6 case. This Court sentenced Honeycutt to 90 days' incarceration, to be served consecutively to the sentence for the firearms case. Honeycutt's January 6 conduct was certainly more serious than Manwarings, but he did not commit a fresh crime after his participation in the riot.

Other judges have imposed sentences of incarceration in petty offense cases where a Capitol breach defendant committed an unrelated state crime between January 6, 2021 and their federal sentencings. For instance, in *United States v. Herendeen*, 1:21-cr-278-2 (BAH), the defendant, like Manwaring, entered the Capitol through the Senate Wing Door shortly after the initial breach. Herendeen entered at 2:20 p.m., three minutes before Manwaring—and walked straight to the Crypt, where he and Manwaring were part of the same surge that followed other rioters breaching the police line near the Memorial Doors. Unlike Manwaring, Herendeen did not go to the second floor or otherwise further penetrate the Capitol. Instead, he turned around, returned to the lobby with the Senate Wing Door, and exited through a window at the direction of police officers. Herendeen spent a total of 16 minutes in the Capitol, approximately half as long as Manwaring.

Herendeen pleaded guilty to a more serious offense than Manwaring: a violation of 18 U.S.C. § 1752(a)(1) (unlawfully entering or remaining in the Capitol). Chief Judge Beryl A. Howell imposed a sentence of 14 days of imprisonment, to be served in two 7-day installments and 2 months of home confinement, as conditions of a term of 36 months of probation, pursuant to 18 U.S.C. § 3563(b)(10).

Some aspects of Herendeen's conduct on January 6, 2021, were worse than Manwaring's. Herendeen was prepared for violence on January 6: he wore tactical gear, brought bear spray, and posted "If I die, I die saving the nation" on social media prior to traveling to Washington, D.C. He posted photographs and videos of the riot on Facebook afterward, promoting it and celebrating it. Herendeen also attempted to profit from his involvement in the riot by offering to sell photographs of himself in the Capitol.

Herendeen's criminal history is also substantially similar to Manwaring's. Like Manwaring, Herendeen's criminal history contained one prior conviction (for driving while impaired). More importantly, like Manwaring, Herendeen engaged in further criminal conduct after January 6, 2021. Herendeen was arrested and charged in state court with possessing less than 25 grams of a controlled substance. Manwaring's additional criminal conduct—soliciting sex from a child and sending sexually explicit material to a child—is more serious and repugnant than Herendeen's. Unlike Manwaring's situation, however, Herendeen's state case was still pending at the time of his federal sentencing. Ultimately, while Herendeen does not provide a precise match for Manwaring's conduct or criminal history, the aggravating and mitigating factors reach the same balancing point.

The United States is aware of one other case in which a misdemeanor defendant engaged in new criminal conduct between January 6, 2021, and his federal sentencing: *United States v. Vuksanaj*, 1:21-cr-620 (BAH). Like Manwaring, Vuksanaj pleaded guilty to 40 U.S.C. § 5140(e)(2)(G) (unlawful parading, picketing, or demonstrating in the Capitol). Chief Judge Howell imposed 42 days of imprisonment (two be served in three 14-day installments) and 3 months of home confinement as a condition of 36 months of probation pursuant to Section 3563(b)(10). Like Manwaring and Herendeen, Vuksanaj entered the Capitol building though the Senate Wing Door;

just like Herendeen, Vuksanaj entered three minutes ahead of Manwaring. Vuksanaj followed a similar path within the Capitol, but unlike Herendeen and Manwaring, Vuksanaj filmed video of hand-to-hand fighting between rioters and police officers and himself chanting things like "Whose house? Our house," and "Nancy, Nancy," "You serve us," and "Fuck McConnell." Vuksanaj was also personally pushed back by officers attempting to control the crowd, but that did not prompt him to leave the building immediately. Instead, Vuksanaj stayed in the Capitol another 12 minutes. In total, Vuksanaj spent 40 minutes inside the Capitol, approximately 10 minutes more than Manwaring. When FBI agents arrested Vuksanaj, they found him unlawfully in possession of four firearms.[6] The government acknowledges that Vuksanaj's criminal history and his conduct inside the Capitol on January 6, 2021, are both worse than Manwaring's, but the difference is not so large that it suggests Manwaring should escape a sentence of imprisonment.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

---

[6] Vuksanaj has not yet been charged for that offense.

**V.      The Court's Lawful Authority to Impose a Sentence of Incarceration as a Condition of Probation.**

As nine judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same); *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022).[7]

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

But this Court need not decide that question in this case because the government is recommending 45 days in jail as a condition of 36 months of probation,[8] and there is no dispute that a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation). A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10). S*ee United States v. Stenz*, 21-

---

[8] As well as 60 hours of community service, $500 restitution, and the mandatory $25 special assessment.

cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21cr278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21cr278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21cr125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21cr627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21cr620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21cr370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43 (same); *United States v. Cameron*, 22-cr17 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same); *United States v. Jeremiah Carollo*, 22cr44 (APM) (D.D.C. Sept. 13, 2022).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement. For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 45 days in jail as a condition of 36 months of probation, as well as 60 hours of community service, $500 restitution, and the mandatory $25 special assessment. Such a sentence protects the community, promotes

respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence

of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        */s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov

## **CERTIFICATE OF SERVICE**

On November 21, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
For the District of Columbia
Telephone No. (813) 274-6370
michael.gordon3@usdoj.gov